UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | |
|---|---|
| REBECCA DITTMAR, | |
| Plaintiff, | |
| v. | No. 6:21-CV-043-H |
| 3M COMPANY, | |
| Defendant. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Rebecca Dittmar worked for defendant 3M Company for several years before the Brownwood, Texas facility hired her as the Quality Manager.  After more than three years of issues surrounding Dittmar's poor leadership, bad communication skills, and misconduct—as well as a final written warning—3M terminated her.  Dittmar now alleges that 3M (a) violated the Texas Commission on Human Rights Act (TCHRA) by discriminating against her on the basis of her sex, and (b) violated the Age Discrimination in Employment Act (ADEA) by discriminating against her on the basis of her age.  3M moves for summary judgment on both claims.

The Court grants summary judgment in favor of 3M.  As to Dittmar's sex-discrimination claim, she fails to provide "substantial evidence" of pretext as required by Fifth Circuit precedent and thus does not raise a genuine issue of material fact.  As to her age-discrimination claim, Dittmar fails to meet the fourth element of her prima facie case because she cannot show that her replacement was substantially younger or that she was otherwise treated differently on the basis of her age.  In addition, Dittmar fails to raise a genuine issue of material fact as to pretext on her age-discrimination claim.

1.    **Factual and Procedural Background**

    A.    **Dittmar begins working for 3M and eventually transitions to the Quality Manager position in Brownwood.**

Dittmar commenced working for 3M, a global technology and manufacturing company (Dkt. No. 21-6 at 2), at 3M's corporate headquarters in St. Paul, Minnesota (Dkt. No. 21-6 at 4). She worked as a Senior Chemist and Research Specialist for several years (Dkt. No. 21-1 at 4) before transitioning into a Technical Manager position (Dkt. No. 27-1 at 3–4). Dittmar held that role from 2001 to 2005, during which she supervised salaried employees and had approximately fifteen direct reports (*id.*), though this was her only experience supervising employees while at the St. Paul facility. Dkt. No. 21-1 at 5. Dittmar then moved into a position in the CRL Process Laboratory, where she remained until 2017. Dkt. No. 27-1 at 5.

That year, Dittmar applied for a Quality Manager position at 3M's manufacturing facility in Brownwood, Texas. *Id.* at 6–7. Paul Aufenkamp, the Hiring Manager at the time, interviewed Dittmar and eventually hired her for the Quality Manager position, which Gary Iafrate had previously held. *Id.* at 8–10, 81. Shortly after Dittmar's arrival, Aufenkamp left the Brownwood facility (Dkt. No. 21-1 at 40), and Russ Bryan began his position as the Plant Manager (Dkt. No. 27-2 at 23).

As the Quality Manager, Dittmar "was responsible for providing total quality management advice and consulting with the facility's Leadership Team to set short-term strategic direction and operating plans for the plant's manufacturing operation." Dkt. No. 21-6 at 4. She was also responsible for collaborating with various departments and directly supervising the Quality Department, which was composed of approximately 12 to 14 hourly employees. *Id.* In addition, Dittmar was a part of the Leadership Team, which was

composed of all the managers who reported directly to Bryan. *Id.* at 4. At various times while Dittmar was the Quality Manager, the following individuals were a part of the Leadership Team: Chad Benton, Steve Cantrell, Dan Garza, Vince Laquidara, Greg Nelson, Gokul Venkitachalam, and Mark Young. *Id.*

**B.    Issues surrounding Dittmar's leadership arise and continue, despite 3M's repeated efforts to acknowledge and address them.**

During her 2017 year-end performance review, Bryan first acknowledged that Dittmar's leadership style would require some coaching and adjustment and noted that she still needed "to adapt to the plant & manufacturing culture." Dkt. No. 21-7 at 14. At that time, Bryan had already received feedback from other employees at the plant that Dittmar's "leadership style, including the tone of her communications and her demeanor, could come across as abrasive and condescending." Dkt. No. 21-8 at 2.

Issues surrounding Dittmar's leadership style continued in 2018 and 2019, resulting in additional discussions and meetings. In her year-end performance reviews for those years, Bryan continued to stress that Dittmar needed to improve her approach to leading and interacting with her subordinates because her demeanor and attitude were causing tension among her department. *See* Dkt. No. 21-7 at 17, 18. For instance, in her 2018 year-end performance review, Bryan explained that there was "some high [employee] turnover in [her] area of responsibility" and that Dittmar needed to develop a more positive attitude. *Id.* at 17. Similarly, in her 2019 year-end performance review, Bryan stated that Dittmar would "need to continue making progress on how she communicate[d] with and develop[ed] her team and others around her," noting that she had "shown signs of improvement at times[] but then regresse[d] at times." *Id.* at 20. Bryan also gave Dittmar a rating of 2 for the "[d]evelops others and self" category, explaining to her that "this was a continuing area of

– 3 –

concern" because any improvement had not been consistent.  Dkt. No. 25-1 at 17; Dkt. No. 21-7 at 20; *see* Dkt. No. 21-6 at 4.

During that meeting, Bryan also addressed other recent events of concern.  Dkt. No. 25-1 at 17.  Two directors had recently visited the facility and had an encounter with Dittmar that resulted in "a very negative impression of [her]," which reflected poorly on the Brownwood facility and leadership team.  *Id.*  And during a tier meeting, Dittmar had been involved in an exchange with another employee that was "perceived as inappropriate by some," though others had said "it was a normal business conversation [that was] just a little pointed."  *Id.*  Bryan also expressed concerns about the turnover in Dittmar's department, mentioning that about 1/3 of the employees had turned over by this point in time.  *Id.* at 18.  Bryan reaffirmed that 3M needed Dittmar to develop and maintain a consistent, positive leadership and communication style.  *Id.*

Outside of Dittmar's performance review forms and the accompanying meetings to discuss those reviews (Dkt. No. 21-1 at 30, 32), Bryan also met with Dittmar separately on January 3 and 11, 2019 to provide additional leadership coaching (Dkt. No. 25-1 at 2–7).  On January 3, he advised her on how to give and receive feedback and requested that Dittmar develop a plan for overcoming these issues before their next meeting.  *Id.* at 2–6.  During the January 11 meeting, Bryan and Dittmar reviewed her plan and followed up on their previous discussion.  *Id.* at 7.  Dittmar asked Bryan if she was headed towards termination, and Bryan reassured her that terminating her was "the last outcome [he] would want from this process."  *Id.*  Bryan added, however, that if Dittmar did not show progress on her poor leadership skills, he would not be pleased.  *Id.*

**C.    Dittmar receives a final written warning after violating 3M's Electronic Resources Principle.**

In November 2019, Dittmar received a final written warning for violating 3M's Electronic Resources Principle.  Dkt. No. 25-1 at 12–13.  Dittmar had asked David Lenzi, one of her direct reports, to send her his computer login information so that she could access material for an upcoming audit.  Dkt. No. 21-1 at 31.  During this time, Lenzi had been on approved medical leave and was not working in the office.  Dkt. No. 21-4 at 27.  Uncomfortable with the situation, Lenzi reported Dittmar's request to Jim Strickland (*id.*), the Human Resources Manager at the Brownwood facility (Dkt. No. 21-6 at 2).  Lenzi also expressed that he felt like Dittmar was micromanaging his work.  Dkt. No. 21-10 at 2.  Strickland determined that Dittmar had violated 3M's Electronic Resources Principle, which prohibits the sharing of login information.  Dkt. No. 21-7 at 10–11.  Because it was a Level 3 violation, Dittmar received a final written warning.  Dkt. No. 21-4 at 15; Dkt. No. 25-1 at 12, 15.

In Dittmar's final written warning, Bryan noted that this violation was not Dittmar's "first performance incident in the past 12 months."  Dkt. No. 25-1 at 12.  He explained that he and Strickland had met with Dittmar separately to address concerns around her leadership and provide feedback on how interactions with her had been "perceived by peers and subordinates."  *Id.*  The final written warning stated that Dittmar's behavior had led to distrust within the Leadership Team and Quality Team, "which violate[ed] business conduct and employee performance expectations," citing the Respectful Workplace Principle.  *Id.* at 12–13.  It also warned that another violation of 3M's principles or policies could result in termination.  *Id.* at 12.

– 5 –

**D.    3M investigates Dittmar's continued leadership issues following a subordinate's complaint and ultimately terminates her.**

In the spring of 2020, Russell Keller, one of Dittmar's subordinates, filed a complaint against her.  Dkt. No. 25-2 at 175–76.  Bryan and Strickland launched an investigation into Dittmar's leadership and communication issues. Dkt. No. 21-6 at 5; *see* Dkt. No. 21-10 at 14–15.   During this investigation, Bryan and Strickland interviewed Quality Engineers Barbara Bachman and Jenniffer Renfroe.  Dkt. No. 21-6 at 5.  Bachman and Renfroe both shared that, although Dittmar was knowledgeable and did well at holding her subordinates accountable, her interactions with others were often negative and adversarial.  Dkt. No. 25-2 at 6, 11.  Thus, Dittmar could come across as demeaning, condescending, or rude.  *Id.* Bryan also met with Dittmar twice to explain that the investigation was primarily due to her continual pattern of poor leadership and to listen to Dittmar's concerns regarding the investigation.  *Id.* at 13; Dkt. No. 25-3 at 2–3, 5–6.  At the end of the investigation, Bryan and Strickland ultimately determined that Dittmar should be terminated and recommended that 3M do so.  Dkt. No. 21-8 at 3.  Bryan sent the termination-review form for approval and received the required approvals.  Dkt. No. 25-3 at 10.

Thus, on May 7, 2020, Bryan and Strickland informed Dittmar that she had been terminated by 3M (Dkt. No. 27-1 at 14–15) because she had "consistently fail[ed] to adhere with 3M's Code of Conduct and Respectful Workplace principles."  Dkt. 25-3 at 8.  In addition, she had failed to "demonstrate[] the ability to foster an inclusive environment consistent with 3M's ethics and values."  *Id.*  The termination sheet also referenced "multiple examples" where Dittmar had violated 3M's principles and standards, including Dittmar's receipt of the final written warning for violating the Electronic Resources Principle.  *Id.*

###### E.    Dittmar files the present lawsuit, asserting claims of sex- and age-discrimination.

Following her termination, Dittmar sued 3M, alleging sex-discrimination in violation of the TCHRA and age-discrimination in violation of the ADEA.  Dkt. No. 1.  3M moved for summary judgment on both claims, arguing that it did not intentionally discriminate against Dittmar on the basis of her sex or age.  Dkt. No. 19.  Rather, 3M asserts that it terminated her for failing to improve her leadership and communication skills and violating 3M's principles, pointing to her long history with these issues and the final written warning. *Id.*  In response, Dittmar asserts that she not only meets the prima facie elements of her claims but also raises a genuine issue of material fact as to pretext.  Dkt. No. 26.  3M replied to Dittmar's allegations.  Dkt. No. 31.  The motion is ripe for resolution.

### 2.    Legal Standards

#### A.    Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020).  The moving party "bears the initial responsibility of . . . demonstrating the absence of a genuine issue of material fact." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (cleaned up).  Thus, the moving party must "identify those portions of [the record] which it believes demonstrate [that] absence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In evaluating a summary-judgment motion, the Court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Darden v. City of Fort Worth*,

880 F.3d 722, 727 (5th Cir. 2018).  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  "[A] fact is 'material' if its resolution could affect the outcome of the action."  *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (cleaned up).  The Court must consider materials cited by the parties, but it may also consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).

"Where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the nonmovant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301–02 (5th Cir. 2020) (internal quotation marks omitted).  The movant, however, does not need to negate the elements of the nonmovant's case.  *Austin v. Kroger Tex., LP*, 864 F.3d 326, 335 (5th Cir. 2017) (per curiam) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)).

When the moving party has met its burden, "the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings."  *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).  Rather, the nonmovant must identify specific evidence in the record and articulate how the evidence supports its claim.  *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014); *see also* Fed. R. Civ. P. 56(c)(1)(A).  "This burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (internal quotation marks omitted).  Additionally, Rule 56 does not impose a duty on the Court to "sift through the

record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

"A failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (internal quotation marks omitted).  If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (cleaned up).

### B.    The Texas Commission on Human Rights Act

The Texas Commission on Human Rights Act (TCHRA) addresses employment discrimination, including the discharge of an individual on the basis of sex.  Tex. Lab. Code § 21.051; *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007). Specifically, Section 21.051(1) states that "[a]n employer commits an unlawful employment practice if because of sex . . . the employer . . . discharges an individual."  Tex. Lab. Code § 21.051(1).  The TCHRA "is modeled after federal civil rights laws," *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999), and one of its stated purposes is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964," Tex. Lab. Code § 21.001(1).  Accordingly, Texas courts use "analogous federal statutes and the cases interpreting them" for guidance when applying the TCHRA, such as Title VII case law.

– 9 –

*Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001); *see also Hoffmann-LaRoche Inc. v. Zeltwanger*, 144 S.W.3d 438, 446 (Tex. 2004) (explaining that "federal case law may be cited as authority in cases relating to the [TCHRA]").

When deciding an issue of Texas law, federal courts follow the lead of Texas courts. *Myers v. Crestone Intern., LLC*, 121 F. App'x 25, 28 (5th Cir. 2005); *see also Rodriguez v. ConAgra Grocery Prods., Co.*, 436 F.3d 468, 474 (5th Cir. 2006) ("As must federal diversity courts when deciding an issue of state law, we will follow the Texas courts' lead."). Thus, because Texas courts look to and apply federal precedent, federal courts analyzing TCHRA claims apply federal precedent as well. *Arismendez*, 493 F.3d at 607; *Bugos v. Ricoh Corp.*, No. 07-20757, 2008 WL 3876548, at *3 (5th Cir. Aug. 21, 2008). Nevertheless, where Title VII conflicts with the TCHRA, the text of the TCHRA will control. *See Tex. Dep't of Transp.v. Lara*, 577 S.W.3d 641, 650 (Tex. App.—Austin 2019, pet. granted) ("Yet while the courts of Texas must look to federal interpretation of Title VII . . . for guidance on our interpretation of the TCHRA, we consider that guidance at the expense of the statute itself.") (internal citations omitted).

### C.    *McDonnell-Douglas* Burden-Shifting Framework

A plaintiff may bring a discrimination claim using either direct evidence or circumstantial evidence. *Portis v. First Nat'l Bank*, 34 F.3d 325, 328 (5th Cir. 1994). Discrimination claims under the ADEA and the TCHRA that are based on circumstantial evidence are analyzed under the *McDonnell-Douglas* burden-shifting framework. *Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 231 (5th Cir. 2015). Under the *McDonnell-Douglas* framework, the plaintiff must first make out a prima facie case of discrimination—the elements of which vary slightly between the relevant anti-discrimination statutes. *Id.*; *Hassen*

*v. Ruston La. Hosp. Co., L.L.C.*, 932 F.3d 353, 356 (5th Cir. 2019). "Establishment of [a] prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Cnty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981).

If the plaintiff meets her initial burden of satisfying the elements of the prima facie case, then the burden of production shifts to the defendant to establish a "legitimate, non-discriminatory reason" for its adverse employment action. *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 142 (2000)). To meet this burden, the defendant "must provide both 'clear and reasonably specific reasons' for its actions" (*id.* at 513 (quoting *Burdine*, 450 U.S. at 258)) using admissible evidence to support the defendant's nondiscriminatory reason (*Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 236 (5th Cir. 2016); *Hervey v. Miss. Dep't of Educ.*, 404 F. App'x 865, 868 (5th Cir. 2010)). "If the employer is able to articulate a reason, 'the presumption raised by the prima facie case is rebutted and drops from the case.'" *Squyres*, 782 F.3d at 231 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

If the defendant satisfies this burden, "then the burden shifts back to the plaintiff to make an ultimate showing of intentional discrimination." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012). At this third stage of the *McDonnell-Douglas* framework, the burden for a claim under the TCHRA differs from a claim under the ADEA. *Id.* at 440; *Squyres*, 782 F.3d at 231. Under the TCHRA, the plaintiff must establish by a preponderance of the evidence that "either (1) the reason stated by the employer was a pretext for discrimination, or (2) the defendant's reason, while true, was only one reason for its conduct and discrimination is another motivating factor." *Id.* (quoting *Reed*, 701 F.3d at 439–40). By contrast, under the ADEA, "the [plaintiff] must 'prove by a preponderance of

the evidence that the legitimate reasons offered by the defendant were not its true reasons[]
but were a pretext for discrimination." *Id.* (quoting *Reeves*, 530 U.S. at 143).  Thus, the
plaintiff must demonstrate that the defendant would not have taken the adverse
employment action but for the plaintiff's age, which is a more demanding showing than that
required under the TCHRA.  *Id.*; *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475 (5th
Cir. 2015).

### 3.    Analysis

#### A.    The Court grants summary judgment as to Dittmar's sex-discrimination claim because she fails to raise a genuine issue of material fact as to pretext.

3M asserts that it is entitled to summary judgment on Dittmar's sex-discrimination
claim because Dittmar cannot meet the elements of a prima facie case (Dkt. No. 20 at 29–
33) and fails to provide even a scintilla of evidence of pretext (*id.* at 35–40).  Dittmar, on the
other hand, alleges that she can establish a prima facie case (Dkt. No. 30 at 23–24) and raise
a genuine issue of material fact as to pretext, presenting several arguments to suggest that
3M's proffered reasons are pretextual (*id.* at 27–38).[1]  As discussed below, although Dittmar
makes a prima facie claim of sex discrimination (*see infra* Section 3.A.i), Dittmar fails to
create a genuine issue of material fact as to pretext because she does not show substantial
evidence of pretext or any evidence that 3M intentionally discriminated against her (*see infra*
Section 3.A.iii).

---

[1] The Court notes that Dittmar does not argue that her sex was a motivating factor in 3M's
termination decision.  Dkt. No. 30 at 29–38.  Instead, her arguments focus on the issue of pretext.
*Id.*  In any event, Dittmar presents no competent evidence to show that 3M engaged in or was
motivated by intentional discrimination on the basis of sex.  *See infra* Section 3.A.iii; *see also Owens v.
Circassia Pharms., Inc.*, 33 F.4th 814, 834 (5th Cir. 2022) ("An aggrieved employee's evidence must,
at the summary-judgment stage, permit a reasonable inference that the real reason" that "motivated
the adverse employment action" was "impermissible discrimination.").

i.    **Dittmar meets the prima facie elements for her sex-discrimination claim.**

At the outset, Dittmar satisfies her prima facie case.  To establish a prima facie claim of sex discrimination under Title VII—and, consequently, the TCHRA—the plaintiff must show that she (1) is a member of a protected group; (2) was qualified for her position; (3) suffered an adverse employment action by the employer; and (4) was either replaced by someone outside of her protected group or treated less favorably than other similarly situated employees outside of her protected group. *Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 321–22 (5th Cir. 2021); *Owens*, 33 F.4th at 825.[2]

The parties do not dispute that Dittmar meets the first three elements.  *See* Dkt. No. 20 at 29; Dkt. No. 30 at 24.  Dittmar is a woman (Dkt. No. 21-1 at 13); she was qualified for her job as a Quality Manager (*See, e.g.*, Dkt. No. 27-1 at 2–7); and she was terminated (Dkt. No. 21-1 at 8–9; Dkt. No. 27-2 at 70).  Dittmar satisfies the fourth element as well.  The parties agree that Young, a man, replaced her by absorbing her job duties.  *See* Dkt. No. 30 at 25–26; Dkt. No. 31 at 10.  And Fifth Circuit case law indicates a plaintiff is 'replaced' when an employee outside of the protected class absorbs her duties upon the plaintiff's termination.  *See Howard v. United Parcel Service, Inc.*, 447 F. App'x 626, 629 (5th Cir. 2011);

---

[2] The parties dispute whether the fourth element may be satisfied by showing that the plaintiff was replaced by someone outside of her protected class.  Dkt. No. 20 at 29; Dkt. No. 30 at 23.  The Fifth Circuit has described the fourth element in several different ways.  *Compare Owens*, 33 F.4th at 825 (allowing either that the plaintiff be "replaced by someone outside of her protected group or a similarly situated employee outside of her protected group was treated more favorably"), *with Alkawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017) (requiring the plaintiff be "treated less favorably than others similarly situated outside of [her] protected class"), *and Meinecke v. H & R Block of Houston*, 66 F.3d 77, 83 (5th Cir. 2017) ("[A]fter being discharged, her employer replaced her with a person who is not a member of the protected class.").  But regardless, Dittmar fails to raise a genuine issue concerning pretext (*see infra* Section 3.A.iii.), so the Court applies the test most favorable to the plaintiff.  The Court also notes that the Fifth Circuit has applied the two-pronged version of the fourth element when analyzing a TCHRA sex-discrimination claim from an employee whose contract was not renewed and who was ultimately replaced.  *See Ross*, 993 F.3d at 321–22.

*Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 419 (5th Cir. 2009).  Because Dittmar was replaced by someone outside of her protected class, Dittmar meets the fourth and final element of the prima facie case for sex discrimination.  Dkt. No. 27-1 at 53; Dkt. No. 21-1 at 27.  Thus, the burden shifts to 3M to provide a legitimate, nondiscriminatory reason for why Dittmar was terminated.

### ii.    3M has proffered legitimate, nondiscriminatory reasons for terminating Dittmar.

Because 3M provides several legitimate, nondiscriminatory reasons for terminating Dittmar, 3M meets its burden.  The Fifth Circuit has recognized that poor leadership is a legitimate, nondiscriminatory reason for terminating a plaintiff.  *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 320 (5th Cir. 1997); *Casarez v. Burlington N./Santa Fe. Co.*, 193 F.3d 334, 337 (5th Cir. 1999).  Additionally, an employer's reference to "complaints from [the plaintiff's] coworkers about [the plaintiff's] workplace behavior" constitutes evidence of a legitimate, nondiscriminatory reason for terminating the plaintiff.  *Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 620 (5th Cir. 2020); *see also Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 803–04 (5th Cir. 1997) (finding that the employer had satisfied its burden of production by showing that the employee's behavior had resulted in several complaints from coworkers and supervisors, among other parties).  Furthermore, an employer can point to a plaintiff's history of issues, including the plaintiff's receipt of a final warning, to show that the plaintiff was terminated for a legitimate, nondiscriminatory reason.  *See Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 962, 967 (5th Cir. 2016).  Moreover, the plaintiff's violation of workplace policy is also a legitimate, nondiscriminatory reason for adverse action.  *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 659 (5th Cir. 2012).

Here, 3M's termination sheet for Dittmar details the reasons why 3M chose to discharge her, all of which are legitimate and nondiscriminatory.  *See* Dkt. No. 25-3 at 8–11. First, Dittmar had "consistently fail[ed] to adhere with 3M's Code of Conduct and Respectful Workplace principles" and "not demonstrated the ability to foster an inclusive environment consistent with 3M's ethics and values."  *Id.* at 8.  Additionally, Dittmar had a "well-documented pattern" of negative behavior towards her subordinates and other individuals.  *Id.*  Bryan and Dittmar had repeatedly discussed Dittmar's poor leadership skills and 3M's expectations for her.  *Id.* at 8–9.  Furthermore, Dittmar had received a final written warning in November 2019 for violating the Electronic Resources principle.  *Id.* at 8. She was informed at that time that any other violations of 3M's "policies could lead to further disciplinary action[,] up to and including termination."  *Id.* at 8.  In March 2020, 3M received a complaint from one of Dittmar's subordinates regarding her treatment of him.  *Id.* at 9.  3M conducted an investigation, which "revealed that some of [Dittmar's] subordinates continue[d] to describe her leadership behaviors as unprofessional, condescending, and demeaning towards others."  *Id.* at 9.  Thus, 3M made the decision to terminate Dittmar. *See id.* at 8–11.  These reasons constitute legitimate, nondiscriminatory reasons under Fifth Circuit precedent.  Therefore, the burden shifts back to Dittmar to identify competent summary judgment evidence indicating that 3M intentionally discriminated against her.

### iii. Dittmar fails to raise a genuine issue of material fact indicating that 3M's reasons for termination are pretextual.

As noted above, once the defendant provides a nondiscriminatory reason, the plaintiff "bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that [the employer] intentionally discriminated against her because of her protected status."  *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (quoting *Wallace v.*

– 15 –

*Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001)).  To show that there is a genuine issue of material fact as to whether she was fired for sex discrimination, the plaintiff must "put forward evidence rebutting each of the nondiscriminatory reasons [the employer] articulates." *Id.* (quoting *Wallace*, 271 F.3d at 220).  Alternatively, the plaintiff must show either "substantial evidence of pretext from which a jury could infer discriminatory intent or other evidence creating a reasonable inference" that her sex was a motivating factor in her employer's decision to terminate her.  *Walton v. Bisco Industries, Inc.*, 119 F.3d 368, 373 (5th Cir. 1997); *see also Vaughn*, 665 F.3d at 637 (explaining that the plaintiff can show evidence of "pretext [or] mixed-motive").  "Evidence is 'substantial' if it is 'of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.'" *Laxton v. Gap, Inc.*, 333 F.3d 572, 579 (5th Cir. 2003) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996)).  In sum, the plaintiff's evidence to rebut the employer's proffered reason for her termination must be "substantial enough to permit an inference of discrimination." *Walton*, 119 F.3d at 372.

To establish pretext, the plaintiff can "show that [the employer's] proffered explanation is false or unworthy of credence." *Vaughn*, 665 F.3d at 637 (internal quotations omitted).  "Evidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient." *Bauer v. Albermarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999) (quoting *E.E.O.C. v. La. Off. of Cnty. Servs.*, 47 F.3d 1438, 1443–44 (5th Cir. 1995)).  As the Supreme Court explained in *Reeves*, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation." *Reeves v. Sanderson Plumbing. Prods.,*

*Inc.*, 530 U.S. 133, 147 (2000).[3]  Therefore, in some cases, the trier of fact will be able to "reasonably infer from the falsity of the [employer's] explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.*  In those cases, a "plaintiff's prima facie case, combined with sufficient evidence that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148.  In other cases, however, "such a showing by the plaintiff will [still not] be adequate." *Id.*  For instance, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision" or "the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination ha[s] occurred," then no rational factfinder would conclude that the employer acted with discriminatory animus.  *Id.*

    The plaintiff can also establish pretext by "relying on a disparate treatment theory." *Vaughn*, 665 F.3d at 637.  Disparate treatment occurs when an employer treats the plaintiff less favorably than other employees who are outside of the plaintiff's protected class on the basis of that employee's protected characteristic.  *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).  To make a disparate-treatment argument, the plaintiff must point to employees that are appropriate comparators by showing that they are similarly situated to the plaintiff, engaged in nearly identical conduct, and were in nearly identical circumstances.  *Vaughn*, 665 F.3d at 637; *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009).  The plaintiff must then show that the employer treated the plaintiff more harshly from the comparator employee.  *Vaughn*, 665 F.3d at 637; See *Turner v. Kan.*

---

[3] As the Fifth Circuit has previously stated, "*Reeves* concerned whether judgment as a matter of law was proper, but the inquiry for summary judgment is the same." *Inmon v. Mueller Copper Tube Co.*, 757 F. App'x 376, 380 n.5 (5th Cir. 2019).

*City S. Ry. Co.*, 675 F.3d 887, 894–96 (5th Cir. 2012) (pointing to the fact that the employer received "more severe discipline than a similarly situated [] employee" who was outside of the protected class).

At the summary-judgment stage, evidence demonstrating pretext, "taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of [the] defendant's true motive." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 348 (5th Cir. 2019); *see also* Vaughn, 665 F.3d at 639. However, rejection of the employer's proffered reasons does not necessarily compel judgment for the plaintiff. *Walton*, 119 F.3d at 371 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 511). "Employers are 'entitled to be unreasonable' in terminating their employees 'so long as [they] do[] not act with discriminatory animus.'" *Owens*, 33 F.4th at 826 (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)). Therefore, in order to survive summary judgment, the plaintiff "must create a genuine and material fact issue regarding the ultimate question of discrimination." *Jackson v. Fed. Express Corp.*, No. 3:03-CV-2341-D, 2006 WL 680471, at *6 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.).

Here, Dittmar makes several arguments to show that 3M's proffered reasons were pretextual, claiming both that 3M's reasons for terminating her are false or unworthy of credence and that 3M engaged in disparate treatment. Dkt. No. 30 at 29–38. Nevertheless, because Dittmar fails to point to any competent evidence—much less substantial evidence of pretext as required by Fifth Circuit precedent—to raise a genuine issue of material fact as to whether 3M intentionally discriminated against her because of her sex, the Court grants 3M's motion for summary judgment as to Dittmar's sex-discrimination claim.

– 18 –

a.   **Dittmar's disparate-treatment arguments fail because she is unable to point to proper comparators or show that 3M treated her more harshly than similarly situated employees.**

Dittmar puts forth several disparate-treatment arguments to show pretext, alleging that 3M treated other similarly situated individuals outside of her protected class more favorably than her. Dkt. No. 30 at 33–36. Specifically, Dittmar claims that (1) she received more severe treatment with regard to her termination (*id.* at 36); (2) 3M handled complaints about Dittmar from her subordinates more harshly than complaints about other managers from their subordinates (*id.* at 35); (3) she received less training and access to resources than other employees (*id.* at 34); (4) she received less work opportunities than other employees (*id.* at 34–35); (5) her ideas and feedback were not considered by Bryan, and he would seek help from other managers instead (*id.* at 34–35); and (6) Bryan interacted better with the other male managers than with her (*id.* at 35). None of these arguments raise a genuine issue of material fact.

To show that an employer has engaged in disparate treatment, the plaintiff must identify appropriate comparator employees who are outside of the plaintiff's protected class and "produce evidence that [they] were similarly situated employees." *Owens*, 33 F.4th at 827 (quoting *Okoye*, 245 F.3d at 515). The plaintiff must "demonstrate that any of the employment actions 'were taken under nearly identical circumstances'" and that the comparator employee or employees "shared the same job or responsibilities, reported to the same supervisor, had 'essentially comparable violation histories[,]'" and engaged in nearly identical conduct that drew the employer's adverse employment action. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 659 (5th Cir. 2012) (quoting *Lee*, 574 F.3d at 260). Then, the plaintiff must demonstrate that the employer treated the comparator employee more

favorably. *Turner*, 675 F.3d at 894–96. The question of whether an employee is an appropriate comparator is a question of fact for the jury. S*ee Perez v. Tex. Dept. of Crim. Just., Inst. Div.*, 395 F.3d 206, 215 (5th Cir. 2004). Nevertheless, the question of whether a reasonable factfinder could find that the plaintiff is similarly situated to the comparator employee is a question of law. *See, e.g.*, *Vaughn*, 665 F.3d at 640; *Owens*, 33 F.4th at 827–28.

The Fifth Circuit has defined "similarly situated employees narrowly" in the context of Title VII discrimination claims. *Eyob v. Mitsubishi Caterpillar Forklift Am., Inc.*, 745 F. App'x 209, 213 (5th Cir. 2018). In *Lee*, for instance, the Fifth Circuit recognized that employees (1) with different supervisors; (2) who work in different divisions of a company; (3) who faced an adverse employment action too remote in time from that taken against the plaintiff; (4) with different work responsibilities; or (5) with different violations will not be deemed similarly situated. *Lee*, 574 F.3d at 259–60. However, "nearly identical" is not synonymous with "identical," so the situations of the plaintiff and the comparator employee do not need to be completely identical, only "nearly identical." *Lee*, 574 F.3d at 260. "For example, it is sufficient that the ultimate decisionmaker as to employees' continued employment is the same individual, even if the employees do not share an immediate supervisor." *Lee*, 574 F.3d at 260–61. Additionally, "[e]ach employee's track record at the company need not comprise the identical number of identical infractions," but "these records must be comparable." *Id.* at 261.

**Termination.** In the context of her termination, Dittmar fails to present an appropriate comparator or create a genuine issue of material fact as to disparate treatment. Dittmar first claims that Laquidara, the former Environmental Health & Safety Manager (Dkt. No. 27-1 at 272), received more favorable treatment as a male because, according to

Dittmar, he received a PIP before 3M considered terminating him (Dkt. No. 30 at 36). Dittmar also states that Laquidara was treated more favorably because 3M "permitted" Laquidara to retire rather than terminating him. *Id.*

As Dittmar explains in her declaration, Laquidara reported directly to Bryan on the leadership team in his EHS and Security Manager position and had some overlapping responsibilities with Dittmar and the rest of the Leadership Team. *Id.*; Dkt. No. 27-2 at 23. Specifically, all managers on the Leadership Team met regularly as a team; worked closely on safety, quality, supply chain, and financial issues; and occasionally made decisions together. Dkt. No. 27-2 at 23–24. Laquidara and Dittmar are also similar in that they both had conduct-related issues in their violation histories, including complaints from others about the way the two managers treated others, although Laquidara was ultimately investigated due to integrity issues relating to data reporting. Dkt. No. 21-9 at 15; Dkt. No. 27-1 at 270.

Nevertheless, although both Laquidara and Dittmar had conduct-related issues, Laquidara is not similarly situated. Importantly, their violation histories differ in that Dittmar had received a final warning from 3M after she violated the Electronic Resources Principle prior to 3M's investigation of her. Dkt. No. 25-1 at 12–13. Neither Laquidara nor any other manager had violated the Electronic Resources Principle. Dkt. No. 21-8 at 3. And Dittmar does not point to any evidence showing that Laquidara had received a final warning like she had. *See* Dkt. No. 30 at 36.

In addition, Dittmar fails to point to any evidence indicating that Laquidara received a PIP outside of her own deposition. Dkt. No. 30 at 36; Dkt. No. 27-1 at 83–84. In *Turner v. Baylor Richardson Medical Center*, the employee plaintiff relied primarily "upon her own

declaration" and the "conclusory assertions" within it to establish pretext. 476 F.3d 337, 345. The Fifth Circuit explained that "[c]onclusory statements are not competent evidence to defeat summary judgment"; "[i]nstead, [the plaintiff] must offer specific evidence." *Id.* at 344–46. Because Dittmar relies solely on her own conclusory statements, her argument lacks any merit. On the contrary, Bryan answered in his deposition that he had never administered a PIP to Laquidara—or any other member of the Leadership Team, for that matter—during his time at the Brownwood facility. Dkt. No. 21-9 at 15–16. And in Strickland's declaration, as the Brownwood facility's Human Resources Manager, he confirms that Laquidara's personnel file contains no record that Laquidara ever received a PIP. Dkt. No. 21-6 at 5.

Even still, Laquidara was treated similarly in that he was also investigated for his conduct-related issues, particularly the integrity issues surrounding his data reporting. Dkt. No. 21-9 at 15. Laquidara, however, received approved medical leave and was out of the office until May 15, 2018, so Bryan and Strickland were unable to interview him until he returned. *Id.* at 13; Dkt. No. 21-5 at 27. Bryan and Strickland were working on a draft of the termination-review form but had not completed it or submitted it for approval when Laquidara made the decision to retire on May 18, 2018. Dkt. No. 21-9 at 13; Dkt. No. 21-5 at 27. Thus, Laquidara did not receive more favorable treatment with regard to 3M's investigation and termination-recommendation process.

Nevertheless, unlike Dittmar, Laquidara was eligible for retirement and made that choice prior to termination (Dkt. No. 27-1 at 278), which is why 3M did not terminate him. Dittmar, however, was not yet eligible to elect retirement, so 3M could not offer or permit her to exercise that option. Dkt. No. 21-6 at 5. Therefore, Dittmar and Laquidara are not

proper comparators, and Dittmar fails to point to any evidence indicating that she was treated more harshly than Laquidara when 3M terminated her.

Dittmar also argues but fails to show that Iafrate and Cantrell are proper comparators and received more favorable treatment surrounding termination. *See* Dkt. No. 30 at 15–16. Iafrate, who was the Quality Manager before Dittmar (Dkt. No. 27-1 at 9), was permitted to take an individual-contributor role because he was not meeting 3M's performance expectations in that position (Dkt. No. 27-2 at 62). Nonetheless, Iafrate's supervisor at the time he changed positions was not Bryan; in fact, Bryan had not begun working at the Brownwood facility yet. *Id.* at 63; Dkt. No. 21-10 at 25. Thus, because Dittmar and Iafrate had different supervisors, Iafrate is not a proper comparator. Similarly, Cantrell, the former Value Stream Manager (Dkt. No. 27-1 at 19), was also terminated in 2021, but he received a severance package while Dittmar did not. Dkt. No. 27-2 at 66–67. Nevertheless, Dittmar does not discuss Cantrell's violation history or explain how his violation history was "nearly identical" to hers. *See* Dkt. No. 30 at 36. Thus, a reasonable factfinder could not find that Iafrate or Cantrell are proper comparators to Dittmar.

**Complaints**. Dittmar also alleges 3M handled subordinate complaints about her differently than the way it handled subordinate complaints about other members of the Leadership Team (*id.* at 35), but Dittmar fails to show that Young, the Supply Chain Manager (Dkt. No. 27-1 at 23), and Cantrell, the former Value Stream Manager (Dkt. No. 27-1 at 19), are proper comparators or that 3M treated her more harshly in the way it handled complaints.

First, Dittmar does not show that Young and Cantrell are not proper comparators. Dittmar does point to some similarities between her and Young and Cantrell, such as the

fact that all members of the Leadership Team reported to Bryan and had some overlapping responsibilities.  Dkt. No. 27-2 at 23–24.  Dittmar also refers to Strickland's deposition, where he stated that he had received complaints about Young and Cantrell from their subordinates in the past, too.  *Id.* at 43.  And those employees also "complain[ed] that they felt that [the manager] had treated them unfairly or was not listening appropriately to a concern that they had."  *Id.*  Nevertheless, Dittmar does not show any evidence that Young or Cantrell had similar violation histories to her at the time that the complaints were raised.  Dkt. No. 30 at 36.

And Dittmar fails to address the distinction between the circumstances in which her complaints arose and the circumstances in which Young and Cantrell's complaints arose, which is the very reason why Young and Cantrell are not proper comparators.  Strickland received complaints about Cantrell from approximately six or seven people in a group at that time.  Dkt. No. 27-2 at 45.  He also received complaints about Young from "approximately five people" in a group at one time.  *Id.* at 46.  Nevertheless, Strickland only received complaints from "three separate employees" about Dittmar, not from a large group at one time.  *Id.* at 43; 45.  This difference in circumstances accounts for the differences in the way Strickland handled the complaints.  *Id.* at 44.  As he explained in his deposition, in Young and Cantrell's cases, "[i]t did not come to a recommendation for termination for [] Young or [] Cantrell."  *Id.*  "[Those cases] ultimately evolved down to a coaching situation and having them meet with their respective teams where I sat in on the meetings with them."  *Id.*  Strickland, however, did not arrange a coaching session with Dittmar and her team because the complaints about Dittmar were more limited, coming from specific individuals and not departmentwide groups.  Dkt. No. 21-4 at 18–19.  Instead, he "followed

– 24 –

up with [Dittmar] directly . . . and tried to share with [her] what those concerns were." Dkt. No. 21-4. As *Lee* indicates, if there is a difference among the employees that "accounts for the difference in treatment received from the employer, [then] the employees are not similarly situated for the purposes of an employment discrimination analysis." *Lee*, 574 F.3d at 260 (internal citations omitted).

Second, Dittmar fails to show that she was treated "more harshly" than Young or Cantrell or that they received "more favorable" treatment than her. *See Int'l Brotherhood of Teamsters*, 431 U.S. at 335 n.15; *Vaughn*, 665 F.3d at 637. Strickland still followed up with Dittmar and shared feedback on the complaints Dittmar's subordinates had brought and the concerns they had voiced. Dkt. No. 21-4. Thus, he still made her aware of the issues. *See id.* Strickland simply did so in the privacy of a one-on-one conversation as opposed to a meeting with her and her subordinates.[4] *See id.* Because Dittmar fails to show how this treatment was harsher, Dittmar's disparate-treatment argument on this point fails to raise a genuine issue of material fact.

**Training.** Likewise, Dittmar does not raise a genuine issue of material fact as to whether the other members of the Leadership Team are proper comparators or received more favorable treatment. Dittmar does not refer to any specific members of the Leadership Team as proper comparators in her argument. Dkt. No. 30 at 34. Instead, she appears to argue that Bryan failed to train her, pointing to Bryan's deposition where he stated that if someone needs training, he will "[i]dentify the gap, identify some possible training[,] or

---

[4] Interestingly, had the situation been reversed, Dittmar could have also made the alternative argument. She could have alleged that she had received harsher treatment by Strickland sitting in on a meeting between Dittmar and her subordinates and providing coaching to her in front of her subordinates while Young and Cantrell merely received private communications and feedback.

recommend that they seek training on their own to close that gap if [he] identif[ies] the gap for them." Dkt. No 27-1 at 146.  Nevertheless, Dittmar does not provide any evidence showing that Bryan recommended or provided any training to other employees, much less a proper comparator employee.  Additionally, when asked during his deposition if he had recommended additional training to anyone at the Brownwood facility, Bryan answered, "I don't believe I've done that in Brownwood."  Dkt. No. 21-9 at 24.

Dittmar also argues that she was not provided with certain forms or placed on a supervisory email list.  Dkt. No. 30 at 8.  She refers back to her own deposition in which she explained that she did not know where many items and documents were located and that she was not included on a supervisory email list until she heard about it and asked someone to be added to the list, at which point she was added.  Dkt. No. 27-1 at 45–48.  Again, however, Dittmar fails to point to an appropriate comparator or show how she was treated more harshly than other similarly situated employees.  Thus, Dittmar fails to raise a genuine issue of material fact as to her disparate-treatment theory on training.

**Work Opportunities.**  Dittmar also attempts to show disparate treatment by alleging that she was not given the same work opportunities as males on the Leadership Team.  Dkt. No. 30 at 35.  She does not point to any specific comparators here, either.  *See id.*  However, Dittmar does cite her own deposition (*see id.*), where she discussed Benton, the EHS Plant Engineering Manager (Dkt. No. 27-1 at 35), as an example of a male who had received a better work opportunity than her (*id.*).  There, Dittmar asserted that Benton was able to change positions and had "opportunities to broaden and change what he was working on and learning . . . while still staying within the same organization."  *Id.* at 35.  Dittmar explained that she "did not feel" she had those opportunities and was siloed into her role

– 26 –

but went on to explain that she did not express this concern to Bryan. *Id.* Additionally, Dittmar answered that there was never a particular position that she was interested in having that was given to another employee. *Id.* at 36. Consequently, Dittmar fails to demonstrate that she received less favorable treatment than any of the male members on the Leadership Team, including Benton.

**Acceptance of Ideas.** Dittmar also states that she "did not think" that Bryan and the Leadership Team were accepting of her ideas during management meetings. Dkt. No. 30 at 35. Dittmar cites her deposition, where she stated, "[i]t seemed like what I brought up was not going to be accepted as good enough." Dkt. No. 27-1 at 36. Dittmar's argument here borders on a subjective belief, which is insufficient to establish pretext. *See infra* Section 3.A.iii.h. In any event, Dittmar once again fails to point to a proper comparator or show that a similarly situated employee received more favorable treatment. *See id.*

Additionally, Dittmar points to only two occasions where she provided ideas during the Leadership Team meetings. Dkt. No. 30 at 35 (citing Dkt. No. 27-1 at 36–38). As she explained in her deposition, on one occasion, she complained to Bryan about having daily meetings, and he eventually "did make some adjustments" to the way he scheduled meetings, scaling back the meetings and giving the Leadership Team "a couple of days where [they] [did not] have to come up." *Id.* at 36–37. Dittmar also asked Bryan to shorten the length of the meetings, and he considered Dittmar's comment but "said he wanted to maintain the current way [they] were running the meetings." *Id.* at 38. In fact, Dittmar stated that her feelings stemmed from the "very shocked look on [Bryan's] face" when Dittmar provided her comments. *Id.* at 38. She went on to explain that Bryan "acknowledged [that] he would at least think" about her statements. *Id.* Therefore, Dittmar

fails to show that a similarly situated employee was treated more favorably than her on this point.

**Different Interactions.**   Lastly, Dittmar attempts to rely on a disparate-treatment theory by arguing that she "observed Bryan interact[] better with the male managers than with her" and that "he would seek help from other managers and not ask her for information."  Dkt. No. 30 at 35.  First, Dittmar does not point to any specific comparator employees.  *Id.*  Second, this argument also appears to be based on—at least partially—her subjective belief, which does not show pretext.  *See infra* Section 3.A.iii.h.  In fact, in her deposition, Dittmar stated that she felt like she "was the lower level, less important[,] . . . less desired person to work with . . . at times."  Dkt. No. 27-1 at 82.  Third, Dittmar explained in her deposition that she thought Bryan "had a better relationship with [the other members of the Leadership Team] because he knew most of them from the time when he was at the plan previously," not because of their sex.  Dkt. No. 27-1 at 82.

Dittmar also broadly stated that "[t]here were numerous times where there would be activities going on, granted they're maybe late at night," where information was needed, and "[Bryan] would always go to all the other [m]anagers and not to [Dittmar] for information."  *Id.*  However, Dittmar fails to point to any examples where Bryan went to someone else for information that Dittmar could have provided as well, much less a pattern approaching "always."  *See* Dkt. No. 30 at 35.  Because Dittmar does not point to specific evidence showing that she was similarly situated to a comparator employee or show that they were treated more favorably than her, her disparate treatment argument here also fails.

In sum, Dittmar fails to raise a genuine issue as to pretext by arguing that 3M engaged in disparate treatment on any of these bases.  Dittmar fails to point to a proper

comparator or show that they are similarly situated to her, and she is also unable to present

any evidence that she received harsher treatment from 3M compared to her male co-

workers.  *See supra* Section 3.A.iii.a.

> **b.      Dittmar's evidence that 3M did not follow its PIP policy also
> does not raise a genuine issue of material fact because 3M did
> not enforce it differently with male employees.**

Dittmar also asserts that 3M failed to follow company policy by not providing her

with a PIP prior to her termination, which indicates that 3M's proffered reasons were a

pretext for discrimination, but these arguments do not raise a genuine dispute of material

fact as to pretext.  The Fifth Circuit has held that "[a]n employer's failure to follow its own

policies may be probative of discriminatory intent."  *Richardson v. Monitronics Intern., Inc.*,

434 F.3d 327, 336 (5th Cir. 2005).  In the context of terminations, the Fifth Circuit has also

noted that "an employer's failure to follow its internal protocols in terminating an employee

or in reviewing the employee before termination can be evidence of pretext."  *Sears v. Zion*

*Bancorporation NA*, No. 21-10448, 2022 WL 1800779, at *4 (5th Cir. June 2, 2022).

Nonetheless, "[a] defendant's failure to follow its own policy is not probative of

discriminatory animus absen[t] . . . proof that the plaintiff was treated differently than other

non-minority employees because Title VII does not protect employees from the arbitrary

employment practices of their employer, only their discriminatory impact."  *Turner v. Baylor*

*Richardson Med. Ctr.*, 476 F.3d 337, 346 (5th Cir. 2007) (internal quotations omitted).  Thus,

the plaintiff must show some evidence "suggesting that [the employer] adhered to its

disciplinary policies differently in cases involving" employees who are outside of the

plaintiff's protected class.  *See id.*

At the outset, Dittmar shows some evidence that 3M's PIP policy is mandatory. While Dittmar argues that 3M's policy requires that employees be put on a PIP before they can be terminated (Dkt. No. 30 at 30), 3M argues that its PIP policy is discretionary, not mandatory (Dkt. No. 31 at 29).  Both Dittmar and 3M refer to the language of the PIP policy webpage.  Dkt. No. 27-1 at 213.  The webpage begins by stating "[a]t any time, if your performance does not consistently meet expectations, your supervisor *may* recommend a performance improvement plan." *Id.* (emphasis added).  Further down the webpage, under the "Reasons for a Performance Improvement Plan" section, it states that "[a] supervisor *may* implement a Performance Improvement Plan when an employee fails to consistently meet all the performance expectations for their job grade and position at any time during the year." *Id.* (emphasis added).  However, in the "Importance of Meeting Expectations" section, the webpage states that "[e]mployees who are not performing their jobs to 3M's expectations *will* be placed on a performance improvement plan." *Id.* (emphasis added).  Based on that language, there is at least some—though little—evidence that the PIP policy is mandatory, requiring that 3M place employees who are not performing their jobs to 3M's expectations on a PIP.  *See id.*

Additionally, Dittmar shows at least some evidence that her conduct fell under the types of conduct that are appropriate for a PIP.  3M argues that PIPs are given to individuals who are struggling with meeting individual performance expectations, not conduct-related issues, such as Dittmar's leadership issues.  Dkt. No. 31 at 27.  Dittmar, however, points to the 3M Performance Improvement Plan template and the sample reasons included in it as evidence that 3M was required to put her on a PIP before terminating her.  Dkt. No. 30 at 31.  The template includes, among other examples, the following sample

reason for a PIP: "[y]ou had difficulty working with your team members, peers, and managers in the organization and did not fully meet performance expectations aligned with 3M's cultural pillars and values including . . . [the] Teamwork and Respectful Workplace Principle." Dkt. No. 27-2 at 1. According to the termination sheet, Dittmar was terminated because she had violated the Teamwork and Respectful Workplace Principle, among other reasons. Thus, Dittmar provides at least some evidence that she should have received a PIP before 3M terminated her employment.

Nonetheless, Dittmar must show evidence that 3M enforced its PIP policy differently in cases involving males in order to raise a genuine issue of material fact as to pretext, and she has not done so. As discussed in Section 3.A.iii.a, Dittmar alleges that 3M placed Laquidara on a PIP, pointing only to her own deposition as evidence. Dkt. No. 27-1 at 83–84. Dittmar's conclusory statement, however, is not competent evidence. *See supra* Section 3.A.iii.a; *see also Turner*, 476 F.3d at 345–46. Moreover, her assertion is rebutted by Bryan's statement that he had never given anyone on the Leadership Team, including Laquidara, a PIP (Dkt. No. 21-9 at 15–16) and Strickland's confirmation as the Human Resources Manager that there is no record of a PIP in Laquidara's personnel file (Dkt. No. 21-6 at 5). Thus, in the absence of evidence showing that 3M placed Laquidara on a PIP while failing to place Dittmar on one, Dittmar's assertions here fail.

> **c.   3M's investigation does not indicate pretext because 3M did not follow its policies differently with male employees and conducted an adequate investigation.**

Dittmar also attempts to demonstrate that 3M's proffered reasons were pretextual by arguing that 3M (1) failed to follow its own investigation policies, and (2) did not conduct an adequate investigation, but these arguments do not create a genuine issue of material fact.

Regarding her claim that 3M did not follow its investigation policies, Dittmar points to a long list of evidence.  Dkt. No. 30 at 31–32.  For instance, she argues that Bryan occasionally failed to keep dates and times on documents, did not give his contemporaneous handwritten notes to HR but instead transcribed them, and failed to follow up with an employee that had experienced positive interactions with Dittmar.  *See id.*  3M raises several arguments in response to show that Bryan had substantially complied with 3M's investigative guidelines.  Dkt. No. 31 at 18–19.  Even if 3M had failed to follow its investigative policies, however, as discussed in Section 3.A.iii.b above, Dittmar must show that 3M followed these policies differently with people outside of her protected class to raise a genuine issue of material fact as to pretext.  She fails to do so.  *See* Dkt. No. 30 at 31–33.  To the contrary, Dittmar admits that Bryan failed to follow 3M's investigative policies when investigating Laquidara, too.  *Id.* at 16.

Nevertheless, Dittmar also alleges that 3M simply did not conduct an adequate investigation.  *Id.* at 32–33.  The Court recognizes that "[a]n employer's investigatory choices might, depending on the facts of a particular case, be suspicious in a way that renders the 'defendant's explanation . . . unworthy of credence' and permits an inference of discrimination.  *Owens*, 33 F.4th at 828–29.  However, evidence of an allegedly inadequate

investigation "does not require [the Court] to evaluate whether an employer's investigatory practices were sufficient or correct, but only whether, considered with all other evidence, they tend to permit a rational inference that the employer's ultimate reason for taking an adverse action is unbelievable." *Id.* at 829 (emphasis omitted).  Ultimately, "[w]hether evidence does so in a particular case depends on its 'nature, extent, and quality.'" *Id.* (quoting *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 889, 903 (5th Cir. 2000)).

In *Owens*, for instance, the Fifth Circuit determined that the employer's investigation was not inadequate, "let alone inadequate in a way that could give rise to a reasonable inference of pretext for discrimination." *Id.* at 830.  The employer conducted "serious investigations" in which it "interviewed relevant witnesses" and considered relevant company policy. *Id.* at 829.  Additionally, while the Fifth Circuit noted that the employer "certainly could have interviewed more or different people, the mere fact that [the employer] did not conduct these investigations as [the plaintiff] might have preferred [was] not sufficient to show that the investigations were inadequate." *Id.*  The plaintiff argued that the investigation was inadequate because the employer had failed to interview the plaintiff's team. *Id.*  Nevertheless, the Fifth Circuit noted that while the investigating employee had not interviewed the plaintiff's team, the investigating employee had held conversations with the plaintiff's team outside of the investigation. *Id.* at 830.  Specifically, the investigating employee understood the plaintiff's deficiencies based on calls, observations, peer coaching reports, and other conversations with her subordinates. *Id.*

Here, Dittmar fails to create a genuine issue of material fact as to whether 3M conducted an inadequate investigation.  Like the employer in *Owens*, 3M conducted an investigation in which it interviewed witnesses and considered whether Dittmar had

violated company policy.  *See* Dkt. No. 25-2 at 6, 11; Dkt. No. 25-3 at 8–11.  During his

investigation, Bryan interviewed Quality Engineers Barbara Bachman and Jenniffer Renfroe

to discuss concerns about Dittmar's leadership qualities and interactions with others.  Dkt.

No. 25-2 at 6, 11.  He took notes during these meetings and had Strickland attend them as

well.  *Id.*  And similar to the investigating employee in *Owens*, Bryan relied in part on

previous information he had learned from observations, discussions with Dittmar's

subordinates, and even conversations with Dittmar about her deficiencies in leadership as

well as her previous violation of the Electronic Resources Principle.  *See, e.g.*, Dkt. No. 21-7

at 17, 20; Dkt. No. 21-9 at 243–45.  Consequently, Dittmar is unable to show that 3M's

investigation was inadequate, much less that it was inadequate in a way that permits a

rational inference that 3M's proffered reasons are unbelievable.

> ### d.  Dittmar's receipt of some positive feedback does not show pretext because 3M's proffered reasons for terminating her have consistently included inconsistent leadership.

Dittmar also attempts to establish pretext by showing that she did receive some

positive feedback on her leadership approach and improvement but was still fired for

deficiencies in leadership.  Dkt. No. 30 at 29.  She cites *Paulissen v. MEI Techs., Inc.*, 942 F.

Supp. 2d 658, 666–67 (S.D. Tex. 2013), and *Williams v. Time Warner Operation, Inc.*, 98 F.3d

179, 183 (5th Cir. 1996), in arguing that 3M's proffered reasons for terminating her are

inconsistent with the feedback she received, which evidences pretext.  *Id.*

The cases are distinguishable.  In *Paulissen*, the defendant-employer provided two

different reasons for terminating the plaintiff-employee: one in the letter of discharge and the

other in its motion for summary judgment.  *Paulissen*, 942 F. Supp. 2d at 668.  In its motion

for summary judgment, the defendant stated that the plaintiff had been discharged for

performance deficiencies. *Id.* The court held that there was a genuine issue of material fact as to pretext not just because of the inconsistency in the defendant's proffered reasons but also because the plaintiff's performance reviews contradicted the defendant's proffered reason that the plaintiff had demonstrated poor performance. *Id.*

Similarly, in *Williams*, the defendant-employer claimed that it terminated the plaintiff-employee after his supervisor had given a negative oral recommendation. *Williams*, 98 F.3d at 181. The plaintiff showed, however, that the same supervisor had given him a positive, written appraisal four months before the oral recommendation and another positive, written appraisal one month after. *Id.* at 181–82. Based on this and other evidence, the Fifth Circuit determined that there was a genuine issue of material fact and that the district court's granting of summary judgment should be reversed. *Id.* at 182–83.

Here, however, 3M's termination sheet clearly states that Dittmar was terminated in part because of her inconsistent leadership qualities (Dkt. No. 25-3 at 8–11), and 3M has consistently cited that reason, including in its motion for summary judgment (*see* Dkt. No. 20). And although 3M has provided both positive and negative feedback, this feedback does not contradict the termination sheet's statement that Dittmar failed to remain consistent in showing improvement. Dkt. No. 25-3 at 8. On the contrary, that evidence bolster's 3M's proffered reason that Dittmar was unable to show a consistent improvement in her leadership skills. *See id.*

Even still, case law demonstrates that the presence of both positive and negative feedback in an employee's record does not necessarily show pretext. For instance, in *Brown v. Home Depot USA, Inc.*, the Fifth Circuit concluded that even though the plaintiff had previously received awards for his performance, the plaintiff failed to raise a genuine dispute

of material fact as to pretext concerning the defendant's proffered reason that it had

terminated the employee for a history of poor performance. 642 F. App'x 465, 468 (5th Cir.

2016). Courts in other cases have also determined that a plaintiff's ability to show some

positive feedback is not sufficient to create a genuine issue as to whether the employer's

reasons are false or unworthy of credence. *See, e.g.*, *Turner v. Baylor Richardson Med. Ctr.*,

No. 3:03-CV-2139-P, 2005 WL 1313414, at *7 (N.D. Tex. May 31, 2005) (Solis, J.); *Naghani

v. Shell Expatriate Emp. US Inc.*, No. H-17-3836, 2020 WL 2527481, at *5 (S.D. Tex. May 18,

2020) (Miller, J.). Thus, Dittmar fails to show any evidence of pretext by pointing to some

positive feedback that she received during her employment with 3M.

> **e.    Dittmar also fails to raise a genuine issue of material fact as
> to pretext by pointing to remarks that Bryan and other
> unnamed speakers made.**

Dittmar asserts that remarks made by Bryan and other unnamed speakers evidence

pretext. Dkt. No. 30 at 13, 16, 29–30. Fifth Circuit precedent makes clear that "[a]n oral

statement exhibiting discriminatory animus may be used to demonstrate pretext." *Laxton*,

333 F.3d at 583. The remark, however, must (1) "demonstrate discriminatory animus," and

(2) "be made by a person primarily responsible for the adverse employment action or by a

person with influence or leverage over the formal decisionmaker." *Id.* Additionally,

"[s]tray remarks with no connection to an employment decision cannot create a fact issue

regarding discriminatory intent and are insufficient to defeat summary judgment." *Scales v.

Slater*, 181 F.3d 703, 712 (5th Cir. 1999).

None of the remarks that Dittmar refers to meet these requirements. Dittmar first

points to a few conversations between her and Bryan. Dkt. No. 30 at 16. During one

conversation, Dittmar told Bryan that she enjoyed running to which Bryan asked her, "who

was chasing you?"  Dkt. No. 27-1 at 31, 139.  Noting that both he and Dittmar owned jeeps, Bryan also invited her to go off-roading several times (*id.* at 25, 138) and asked her why she had a jeep if she did not use it to go off-roading (*id.* at 29).  None of these comments refer to her sex, much less evidence any discriminatory animus towards her sex.  These comments were also not connected to 3M's decision to terminate her but were simply stray remarks. *See id.* (showing that Dittmar described Bryan's off-roading comment as having been "made in passing"); *id.* at 31–32 (showing that Dittmar stated that Bryan's comment about running was made "probably just once" and referred to his personal dislike of running for exercise). Thus, these statements do not raise a genuine issue of material fact as to pretext.

Dittmar also points to her deposition where she stated that other members of the Leadership Team had made comments about her sex, although she did not name a particular person or a particular instance.  Dkt. No. 27-1 at 32–34.  These comments do not evidence discrimination because they were not made by individuals with authority over Dittmar's termination and were also not connected to her termination.  As such, Dittmar's argument as to pretext on this basis fails as well.

> ### f.   Bryan and Strickland's conduct and deposition answers do not indicate that 3M's proffered reasons are false or unworthy of credence.

Dittmar also claims that Bryan and Strickland's conduct and deposition answers show that they had already made the decision to terminate Dittmar before they investigated her.  Dkt. No. 30 at 36–38.  First, Dittmar points to Bryan's and Strickland's depositions to show that they were "trying to justify a pre-determined termination decision when they investigated [Dittmar] in the spring of 2020."  *Id.* at 37.  In response, 3M argues that Bryan "testified that the draft of the termination-review form was not completed or

submitted until after he interviewed [Dittmar], which was the final step of the investigation." Dkt No. 31 at 16 (emphasis omitted).  In his deposition, Bryan initially stated that he had not recommended to terminate Dittmar before the investigation was complete.  Dkt. No. 21-9 at 14.  Nevertheless, Bryan later stated that it was "[p]ossible" that he had recommended to Strickland that Dittmar be terminated prior to the last time he met with Dittmar.  *Id.* at 15.  Additionally, in Strickland's deposition, he stated that the investigation was already complete by the time Bryan held his follow-up meetings with Dittmar.  Dkt. No. 21-5 at 20.  Strickland later explained that at the time of Bryan's last meeting with Dittmar, the recommendation to terminate her had already been made, although the final approvals had not yet been made.  *Id.* at 21.  He corrected this on his errata sheet, however, stating that he and Bryan had not prepared the termination-review form until April 27, 2020 and had decided to recommend terminating Dittmar either the day before or on April 27, 2020.  *Id.* at 35.

The inconsistency of this evidence does create a genuine issue as to whether Bryan recommended to Strickland that Dittmar be terminated before his last two meetings with her to complete the investigation.  However, the evidence does not create a genuine issue as to whether Bryan and Strickland had determined they were going to terminate Dittmar prior to investigating her.  Dittmar does not point to any other evidence indicating that the decision to terminate her had been made earlier.  Moreover, this evidence does not cast doubt on 3M's proffered, non-discriminatory reasons for firing her—only whether Bryan had recommended termination prior to his last meeting with Dittmar.  *See Vaughn*, 665 F.3d at 639.

Dittmar's evidence also falls short when compared to the evidence that the plaintiff showed in *Laxton v. Gap, Inc*, 333 F.3d 572, 582 (5th Cir. 2003), a case in which the Fifth Circuit held that a jury may have reasonably concluded that the employer was justifying a pre-determined decision to terminate the plaintiff and reversed the district court's grant of judgment as a matter of law.  There, the evidence showed that "[o]nly six weeks [had] elapsed between [the plaintiff's] first [w]ritten [w]arning and her termination, and during that time her supervisors never gave her the chance to explain her conduct or improve it." *Id.* at 581.  Dittmar does not point to any evidence like that here.  On the contrary, the record supports 3M's proffered reasons included in Dittmar's termination-review form.  *See* Dkt. No. 25-3 at 8–11; *see also supra* Section 1 (discussing the factual background).

Dittmar also alleges that "Bryan's backtracking on the offer to go down a path 'together' to try to find [Dittmar] an individual contributor role[] and then 'ghosting' her on that when she told him that is what she would prefer to do" is additional conduct that evidences pretext.  Dkt. No. 30 at 37.  She points to both her deposition and Bryan's deposition, explaining that Bryan asked her during a meeting about whether she was interested in an individual contributor role (Dkt. No. 27-1 at 69–70, 169–70), and she later confirmed that she was (*id.* at 69–70).  Bryan stated in his deposition that at that time, he told Dittmar there were no specific positions at the Brownwood facility but that maybe more positions would become available in the future.  Dkt. No. 21-10 at 11.  He also mentioned that two other locations could be possibilities.  *Id.*  Bryan noted, however, that he and Dittmar did not follow up on this conversation again and that "[i]f Dittmar wanted to apply for the job, she was welcome to apply for the job."  *Id.*  Dittmar also noted in her

deposition that she knew of positions that were open but never expressed interest or applied to those positions.  Dkt. No. 27-1 at 70–71.

As the Fifth Circuit has stated, Title VII and the TCHRA do not protect an employee from unfair business or employment decisions, only against decisions motivated by unlawful, discriminatory animus.  *Nieto v. L&H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997); *Harville v. City of Houston, Mississippi*, 945 F.3d 870, 877–78 (5th Cir. 2019); *Reed*, 701 F.3d at 434 n.4.  Once again, Dittmar fails to show how Bryan's conduct, however unfair, was based upon discrimination.  She does not, for example, point to instances where Bryan helped another employee outside of the protected class move into an individual contributor role.  *See* Dkt. No. 30 at 37.  Thus, she does not raise a genuine issue of material fact as to pretext on this basis.

> **g.  Dittmar's argument that 3M's two reorganizations and hiring, retention, and termination decisions during those reorganizations show pretext also fails.**

Dittmar also points to evidence that 3M had two reorganizations occur near the time when Dittmar was terminated, arguing that 3M's termination of Dittmar while keeping and hiring other employees outside of her protected class during these reorganizations evidences bias.  *Id.* at 37–38.  Dittmar's argument here, then, appears to be that 3M's proffered reasons for terminating her were actually pretext for a reduction in force, which was actually pretext for intentional discrimination against her.  *See id.*  The Court finds this argument odd because Dittmar does not otherwise argue that this is a reduction-in-force discrimination case.  *See* Dkt. No. 30.  To the contrary, Dittmar argues that this is a replacement case and that Young replaced her when he absorbed her duties.  Dkt. No. 30 at 25–26.

In any event, Dittmar does discuss some evidence indicating that two reduction-in-force events occurred around the time that Dittmar was terminated (*see* Dkt. No. 27-1 at 100–03), although the exact dates of these reorganizations are unclear (*see* Dkt. No. 21-9 at 7–9).  She also points to Bryan's 2020 year-end performance review sheet, which states, among other notes: "Re-organization developed and executed.  Termination of quality manager, combined rol[es] of quality mgr and supply chain mgr."  Dkt. No. 27-2 at 8. Bryan, however, did not include Dittmar's position in his list of people who were terminated during the reorganizations (*see* Dkt. No. 21-9 at 7–9), and Strickland testified that Dittmar's position was never considered during the re-organizations (Dkt. No. 21-4 at 11).  In addition, the information included in Bryan's 2020 year-end performance review sheet does not clearly indicate that Dittmar's termination was related to the reorganization. *See* Dkt. No. 27-2 at 8.

Nevertheless, even if 3M had terminated Dittmar as part of a reduction in force, Dittmar fails to point to any evidence in the record indicating that 3M intentionally discriminated against her on the basis of her sex when it chose to terminate her.  And the evidence before the Court does not support such an assertion.  In fact, Bryan stated in his deposition that the three employees he could recall being terminated as part of the reorganizations were Cody Golson, Eric Dick, and Cantrell.  Dkt. No. 21-9 at 8. Additionally, Nelson, a woman, was retained and eventually promoted to the Quality Manager role after Young sometime in 2021, which cuts against Dittmar's argument that 3M was biased against Dittmar on the basis of sex.  Dkt. No. 27-1 at 110; Dkt. No. 27-2 at 64.  At best, then, Dittmar raises the possibility that she might have been terminated as part of a reduction in force, but a reduction in force alone is "a legitimate, nondiscriminatory

reason for discharge." *E.E.O.C. v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996); *see also Walther v. Lone Star Gas Co.*, 952 F.2d 119, 123 (5th Cir. 1992).  As such, Dittmar fails to present substantial evidence of pretext or otherwise show 3M intentionally discriminated against Dittmar because of her sex during 3M's reorganizations.

### h.   Dittmar's subjective beliefs are also insufficient to raise a genuine issue of material fact as to pretext.

As noted in Section 3.A.iii.a, Dittmar appears to rely in part on her own subjective beliefs, but these arguments fail to raise a genuine issue as to pretext.  For instance, Dittmar states in her response that she "did not feel that she was given the same opportunities as males on the Management Team," and "did not think that her ideas were accepted as helpful."  Dkt. No. 30 at 35.  She also relies on portions of her deposition where she made statements such as "[i]t seemed like what I brought up was not going to be accepted as good enough" (Dkt. No. 27-1 at 36) and "I was the lower level, less important, less – less desired person to work with, it seemed like at times."  Dkt. No. 27-1 at 82).

As Fifth Circuit case law has repeatedly clarified, however, a plaintiff's subjective belief is not sufficient to establish pretext or create a fact issue.  *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 153 (5th Cir. 1995); *Little v. Republic Ref. Co.*, 924 F.2d 93, 96 (5th Cir. 1991); *Ray v. Tandem Computs., Inc.*, 63 F.3d 429, 434 (5th Cir. 1995).  Therefore, arguments rooted in Dittmar's subjective beliefs are insufficient to create a genuine issue of material fact.

In sum, although Dittmar raises several arguments in an attempt to raise a genuine issue of material fact as to whether 3M's proffered reasons are actually pretext for intentional discrimination, each of these arguments fail.  Ultimately, "evidence that does not imply pretext taken alone does not do so when cumulated."  *Tex. Instruments, Inc.*, 100

F.3d at 1186–87.  Therefore, the Court grants summary judgment as to Dittmar's TCHRA sex-discrimination claim.

**B.    The Court grants summary judgment as to Dittmar's ADEA age-discrimination claim because Dittmar fails to meet the prima facie elements and is unable to raise a genuine issue of material fact as to pretext.**

3M asserts that it is entitled to summary judgment on Dittmar's sex-discrimination claim, too, because Dittmar cannot meet the prima facie elements (Dkt. No. 20 at 40–45) nor raise a genuine issue of material fact as to pretext (*id.* at 45–47).  Dittmar, however, asserts that it can make out a prima face case (Dkt. No. 30 at 24–27) and present a genuine issue of material fact as to pretext, pointing to the same arguments that she raised for her sex-discrimination claim (*id.* at 27–38).  As discussed below, Dittmar fails to meet the fourth element of her prima facie case.  *See infra* Section 3.B.i.  And even if she could, Dittmar fails to show substantial evidence of pretext or any intentional age discrimination on 3M's part. *See infra* Section 3.B.iii.  Therefore, summary judgment is granted.

**i.    Dittmar does not establish a prima facie case of age discrimination under the ADEA because she cannot meet the fourth element.**

Under the ADEA, an employer may not "discharge any individual . . . because of such individual's age."  29 U.S.C. § 623(a).  The ADEA defines the protected class as individuals who are 40 years of age or older.  29 U.S.C. § 631(a).  To establish her prima facie claim, the plaintiff must show that she (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action, such as a discharge; and (4) was either (i) replaced by someone outside of her protected class; (ii) replaced by someone younger; or (iii) otherwise discharged because of her age.  *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir. 1993).

The first three elements for an ADEA claim and a Title VII discrimination claim are identical (*Bauer*, 169 F.3d at 966), and the parties do not dispute that Dittmar meets those three elements. *See* Dkt. No. 20 at 45; Dkt. No. 24 at 40. Dittmar had just turned 54 years old at the time that she was terminated (*see* Dkt. No. 21-1 at 2, 8–9); she was qualified for her position (*see, e.g.*, Dkt. No. 27-1 at 2–7); and 3M terminated her employment (Dkt. No. 21-1 at 8–9; Dkt. No. 27-2 at 70).

As to the fourth element, Dittmar first argues that she was replaced by someone younger. Dkt. No. 30 at 25. Dittmar's replacement, Young, was born in May 1970 whereas Dittmar was born in May 1966, making him four years younger than her. Dkt. No. 21-1 at 2; Dkt. No. 27-2 at 14. However, as the Supreme Court recognized in *O'Connor v. Consolidated Coin Caterers Corporation*, "the replacement of one worker with another worker insignificantly younger" does not raise an inference of age discrimination. 517 U.S. 308, 313 (1996). Instead, the Supreme Court explained, "the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination." *Id.* In *Rachid v. Jack in the Box, Inc.*, the Fifth Circuit considered the question of what age gap constituted "substantially younger," explaining that a five-year age difference was a "close question." 376 F.3d 305, 313 (5th Cir. 2004). The Fifth Circuit, however, did not reach this issue or provide a clear answer, deciding the case on other evidence instead. *See id.*

Nonetheless, in *Earle v. Aramark Corporation*, the Fifth Circuit found that a four-year age difference did not constitute a substantial age gap and required the plaintiff to show that one of the other prongs of the fourth element could be satisfied instead. 247 F. App'x 519, 523 (5th Cir. 2007). Here, then, because the age gap is only four years, Young is not

– 44 –

"substantially younger." *See id.*  And because Young was also inside the protected age group (Dkt. No. 27-2 at 14), Dittmar cannot show that prong of the fourth element, either.

Thus, to meet the fourth element, Dittmar must present other evidence indicating that she was treated differently on the basis of her age.  To show this, Dittmar argues that 3M "treated her in a disparate manner by terminating her in a reorganization while retaining the substantially younger leadership team members."  Dkt. No. 30 at 26–27.  As discussed in Section 3.A.iii.g, this argument contradicts Dittmar's argument that she was replaced by Young.  In addition, Dittmar fails to point to any evidence indicating that 3M engaged in disparate treatment by terminating her while treating similarly situated individuals in nearly identical circumstances better.  *See Mzyk v. N. E. Indep. Sch. Dist.*, 397 F. App'x 13, 15 (5th Cir. 2010) (citing *Lee*, 574 F.3d at 253).

And while Dittmar argues that 3M's retention, hiring, and firing decisions evidence discrimination on the basis of age (Dkt. No. 30 at 26–27), her argument falls well short.  As noted above, Young is not "substantially younger" than Dittmar, but he was still retained by 3M and replaced Dittmar in the Quality Manager position, which cuts against her argument.  Dkt. No. 27-1 at 109.  And although Cantrell—who is also in the ADEA's protected class (Dkt. No. 27-2 at 16)—was terminated as part of the reorganization (Dkt. No. 27-1 at 101–02; Dkt. No. 30 at 26), Dittmar does not address the ages of the two other employees who were terminated as part of the reorganization (*see* Dkt. No. 21-9 at 8). Dittmar also points to three people that Bryan hired or moved into management roles (Dkt. No. 30 at 17), including Nelson, who was approximately 47 years old at the time that Dittmar was terminated (Dkt. No. 27-2 at 18).  Nevertheless, Dittmar also does not include

the ages of the two other individuals, Chris[5] and Scott Larose (Dkt. No. 30 at 17), and Bryan's deposition does not include any information regarding Chris or Larose's ages outside of Bryan's belief that Larose is younger than him (Dkt. No. 27-2 at 65–66).

In addition, at the time of Dittmar's termination, the ages of members of Leadership Team that have been included in the record ranged from approximately 47 years old to 50 years old, putting them all within ADEA's protected class (*id.* at 14, 15, 17, 18). And notably, Bryan is only two years younger than Dittmar, making him approximately 53 years old at the time that Dittmar was terminated. *Id.* at 13. As the Fifth Circuit has previously explained, "discrimination is less likely when the supervisor is in the same protected class as the plaintiff." *McMichael*, 934 F.3d at 460–61. Thus, even if 3M did terminate Dittmar as part of a reorganization, no reasonable factfinder would find that 3M intentionally discriminated against Dittmar on the basis of her age. *See also Tex. Instruments, Inc.*, 100 F.3d at 1181 (stating that a reduction in force alone is a legitimate, nondiscriminatory reason for termination).

Because Dittmar fails to meet any of the fourth element's three prongs, Dittmar is unable to make a prima facie case of age discrimination. As such, summary judgment as to Dittmar's ADEA age-discrimination claim is appropriate. Nevertheless, the Court addresses whether Dittmar raises a genuine issue of material fact as to pretext, ultimately concluding that she does not. *See infra* Section 3.A.iii.

---

[5] Dittmar's response excludes his name entirely (Dkt. No. 30 at 17), and Bryan's deposition does not include Chris's last name (Dkt. No. 27-2 at 65).

      ii.    **3M has provided legitimate, nondiscriminatory reasons for terminating Dittmar.**

As discussed in greater detail in Section 3.A.ii, 3M has provided legitimate, nondiscriminatory reasons for terminating Dittmar.  In short, Dittmar (1) had a long history of issues surrounding her poor leadership skills, which is evidenced by her year-end reviews, additional coaching meetings, and the feedback that she received; (2) violated the Electronic Resources Principle, which resulted in a final written warning; and (3) was the subject of an investigation following a complaint from her subordinate that culminated in Bryan and Strickland recommending that 3M terminate Dittmar for continuing to violate 3M's principles.  *See supra* Section 3.A.ii.

      iii.    **Dittmar fails to raise a genuine issue of material fact as to pretext.**

Dittmar points to the same arguments as those raised in her sex-discrimination claim in an attempt to raise a genuine issue of material fact as to pretext on her age-discrimination claim.  Dkt. No. 30 at 29–38.  Nevertheless, as discussed below, Dittmar fails to show substantial evidence of pretext or intentional age discrimination by 3M.  *See infra* Section 3.A.ii.

      a.    **Dittmar's disparate-treatment arguments fail because she is unable to point to proper comparators or present even a scintilla of evidence that she received harsher treatment.**

As explained in Section 3.A.iii.a., Dittmar raises a wide array of disparate-treatment arguments in an attempt to show that 3M's proffered reasons are pretextual.  Dkt. No. 30 at 33–36.  Similar to the showing that a plaintiff must make for a Title VII disparate-treatment claim, Dittmar must show that 3M "gave preferential treatment to a younger employee under 'nearly identical' circumstances."  *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304 (5th Cir. 2000).  Nevertheless, Dittmar does not point to proper comparators or show that

she was treated more harshly than a similarly situated employee under nearly identical circumstances, so these arguments lack merit.

**Termination.**  Dittmar points to Laquidara, Cantrell, and Iafrate as proper comparators.  Dkt. No. 30 at 36.  Nevertheless, Laquidara is roughly thirteen years older than Dittmar (*see* Dkt. No. 21-1 at 2; Dkt. No. 27-2 at 20); Cantrell is approximately 11 years older than Dittmar (Dkt. No. 21-1 at 2; Dkt. No. 27-2 at 16); and Iafrate is around 5 years older than Dittmar (Dkt. No. 21-1 at 2; Dkt. No. 27-2 at 19).  Thus, none of these employees meet the younger-employee requirement for an appropriate comparator.

Dittmar also argues that 3M's release of age-protected employees, including Dittmar, during reorganizations in 2020 and 2021, along with 3M's retention, hiring, and promotion of substantially younger employees demonstrate that 3M treated Dittmar differently than other similarly situated employees on the basis of age.  Dkt. No. 30 at 36.  Nevertheless, Dittmar does not point to any specific comparator employees or attempt to show how they are similarly situated.  *See id.*  Particularly important in the context of Dittmar's termination, Dittmar also fails to show that all of these employees' violation histories are similar to hers, much less whether they all reported to the same supervisor, had the same job responsibilities, or were in nearly identical circumstances.  *See* Dkt. No. 30 at 36.

**Complaints.**  Dittmar points to Young and Cantrell as proper comparators for her assertion that similarly situated employees received different treatment.  Again, Cantrell is actually older.  Dkt. No. 21-1 at 2; Dkt. No. 27-2 at 16.  Young, however, is four years younger.  Dkt. No. 21-1 at 2; Dkt. No. 27-2 at 14.  As explained in greater detail in Section 3.A.iii.a, however, Young is not a proper comparator because he was not under nearly identical circumstances.  Additionally, Dittmar fails to present any evidence to show that

she was treated more harshly than Young.  *See infra* Section 3.A.iii.a.  Additionally, the fact that Cantrell is older than Dittmar cuts against her argument that 3M engaged in disparate treatment on the basis of age.  *See* Dkt. No. 27-2 at 16.

**Training, Work Opportunities, Acceptance of Ideas, and Different Interactions.** As previously discussed, Dittmar also fails to point to any potential comparator in her response or any evidence to show that she received less favorable treatment with regard to her training and work opportunities and Bryan's acceptance of her ideas and interactions. *See supra* Section 3.A.iii.a.

Ultimately, then, in the context of her age-discrimination claim, Dittmar's attempt to show disparate treatment falls short.  Thus, these arguments are insufficient to create a genuine issue of material fact as to pretext.

      **b.**      **Dittmar's argument that 3M's failure to follow its PIP policy evidences pretext fails because Laquidara is older than her.**

As previously discussed, Dittmar asserts that Laquidara is a proper comparator regarding 3M's PIP policy and argues that 3M treated her more harshly than him under nearly identical circumstances.  *See supra* Section 3.A.iii.b.  Nevertheless, because Laquidara is older, he is not a proper comparator in the context of her age-discrimination claim.  *See* Dkt. No. 21-1 at 2; Dkt. No. 21-7 at 20.  Thus, Dittmar fails to show genuine issue of material fact on this basis as well.

      **c.**      **Bryan's and others' remarks do not raise a genuine issue of material fact as to pretext.**

Similar to Title VII, in the context of the ADEA, evidence of remarks that are just "one ingredient in the overall evidentiary mix" are analyzed using the same two-part test: "the plaintiff must show that the comments involve '(1) discriminatory animus (2) on the

part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker.'" *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 457–48 (5th Cir. 2019) (quoting *Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 236 (5th Cir. 2015)).  Additionally, mere "stray remarks . . . have been held to be insufficient to establish discrimination." *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997).

　　None of the remarks that Dittmar refers to satisfy these two requirements.  *See* Dkt. No. 30 at 13, 16, 19–20.  Neither Bryan's who-was-chasing-you comment (Dkt. No. 27-1 at 139) nor his comments about Dittmar's jeep and off-roading (*id.* at 25, 29, 138) indicate discriminatory animus towards her age.  And the remarks that Dittmar alleges other members of the Leadership Team made—which she did not identify—do not satisfy the second requirement.  *Id.* at 32–34; Dkt. No. 30 at 12–13.  Other members of the Leadership Team were not primarily responsible for her termination, and Dittmar does not provide any evidence indicating that they had any influence or leverage over Bryan's decision to recommend termination.  *See* Dkt. No. 30 at 12–13.  These statements are also stray remarks.  *See supra* Section 3.A.iii.e.  Therefore, these remarks do not provide any indication of intentional discrimination on the basis of age.

> **d.**　**For the reasons previously discussed, Dittmar's assertion that 3M's reorganizations and hiring, firing, and retaining decisions evidence pretext also fails.**

　　In an attempt to show pretext, Dittmar once again argues that 3M's two reorganizations near the time of her termination, along with 3M's retention, hiring, and termination decisions, evidence pretext.  Dkt. No. 30 at 36.  But for the reasons discussed in Section 3.B.i, this argument lacks any merit.

**e.   For the reasons previously discussed, Dittmar's remaining arguments also do not raise a genuine issue of material fact as to pretext.**

As previously discussed, Dittmar's arguments regarding (1) 3M's investigation and any diversion from its investigation policies (*see supra* Section 3.A.iii.c); (2) the positive feedback that Dittmar had received (*see supra* Section 3.A.iii.d); (3) Bryan's and Strickland's inconsistent conduct and deposition answers (*see supra* Section 3.A.iii.f); and (4) Dittmar's subjective beliefs (*see supra* Section 3.A.iii.h) also do not show substantial evidence of pretext or any intentional discrimination by 3M.  Therefore, because Dittmar is unable to raise a genuine issue of material fact as to pretext, summary judgment is warranted as to her age-discrimination claim.

In sum, none of the Dittmar's arguments provide even a scintilla of evidence of pretext, much less substantial evidence of pretext as required by Fifth Circuit precedent. *Walton*, 119 F.3d at 373.  Dittmar also fails to present any evidence indicating that 3M intentionally discriminated against her because of her age.  Therefore, summary judgment is granted.

**4.   Conclusion**

Because Dittmar is unable to meet the prima facie elements for her ADEA age-discrimination claim and fails to raise a genuine issue of material fact as to pretext for either her TCHRA sex-discrimination claim and age-discrimination claim, the Court grants summary judgment as to both claims.

So ordered on December 22, 2022.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE